

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 2, 2021

**BY ECF AND EMAIL**

Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Niloufar Bahadorifar*, 21 Cr. 430 (RA)

Dear Judge Abrams:

      The Government respectfully requests that the Court reverse the release order pertaining to defendant Niloufar Bahadorifar ("Bahadorifar" or the "defendant") that was issued yesterday by Magistrate Judge Karen E. Scott in the Central District of California ("CDCA"). As brief background, on June 29, 2021, a grand jury in the Southern District of New York returned a four-count indictment, 21 Cr. 430 (RA) (the "Indictment") charging Bahadorifar with crimes stemming from her efforts to, among other things, assist Iranian nationals, including at least one individual affiliated with Iranian intelligence services, Mahmoud Khazein, in evading sanctions designed to curb the same services' ability to bring about their missions of terror and human rights abuse in Iran and around the globe. On July 1, 2021, Bahadorifar was arrested and later presented before Judge Scott in the CDCA. At the conclusion of that proceeding, at which the Government sought detention, Judge Scott ordered the defendant bailed subject to certain conditions, listed below, but stayed that order for 24 hours to allow Your Honor to consider the Government's appeal.

      As described further below, the defendant is both a risk of flight and a danger to the community. Bahadorifar, a native of Iran, has lived in the United States since 2013 and presently holds both Iranian and United States citizenship. The Government's investigation has revealed that, for at least several years prior to her arrest, the defendant has flouted United States sanctions against Iran. The defendant's conduct has included, among other things, facilitating financial transactions and procuring other services at the direction of Iran-based individuals, such as Khazein, who is an asset of the Iranian intelligence services, including the Iranian Ministry of Intelligence ("MOIS"). The MOIS has been designated by the U.S. Department of the Treasury ("Treasury Department") as a Specially Designated Global Terrorist ("SDGT") for supporting terrorism and perpetrating human rights abuses. The services the defendant has provided to Iran and the Government of Iran included giving access to credit cards issued by U.S. banks and making payments to U.S. persons at the direction of Khazein. By her actions, the defendant provided access to U.S.-based financial networks and services, effectively procuring them for the use of the Iranian intelligence community. In addition, the defendant has amassed significant unexplained

wealth and made concerted efforts to hide it, accumulating hundreds of thousands of dollars in cash and luxury goods over a short period of time and masking the origin of those assets.

The defendant's connections to a foreign country, which include recent travel to that nation and criminal activity conducted within the United States at the behest of a member of that nation's intelligence services; the fact of that nation's lack of any extradition agreement or treaty with the United States; and the defendant's significant financial resources and history of obscuring the source of those funds, among other things, demonstrate her clear flight risk and continued danger to the community. The Government respectfully submits that the defendant should be ordered detained. At the very least, the Government requests that the magistrate judge's release order be stayed until the defendant is transferred to this District, pursuant to Rule 5(c)(3), so that the parties can be heard regarding the issue of detention on a date and time set by this Court.

## Facts

The Government's investigation has revealed that, for at least several years, Bahadorifar has provided illegal services to Iran, including to at least one asset of the Iranian intelligence services. The Government learned this by, among other things, reviewing certain of the defendant's email and cloud accounts, the contents of which law enforcement obtained pursuant to judicially-authorized search warrants, bank records, and surveillance footage. As part of the investigation, the Government has gathered thousands of emails and electronic communications, electronic records, video and voice communications, bank records, and bank video footage.

### The Defendant's Attempted Iran-Related Money Laundering

Since at least 2012, the defendant has exchanged numerous emails and documents with Iranian business partners and family members concerning large currency and gold transactions, including transactions relating to international transfers of tens or hundreds of millions of dollars, including Iranian currency, in countries including Russia and China. The documents appear to relate either to fraudulent schemes, money laundering techniques, or both.

For example, in May 2018, the defendant exchanged documents about multi-hundred-million-dollar international transfers with her fiancé, Saman Mehdizadeh. In a May 2018 WhatsApp exchange, Mehdizadeh told the defendant that the documents looked like money laundering, which he described as a "trick" that people used in countries that could not transfer money to the United States to get money into American banks. During that same time period, the defendant and Mehdizadeh opened a shell company and a bank account to use in furtherance of these money laundering transactions. None was successfully completed, but this shows the defendant's intent and efforts to secretly access and transfer large sums of money.

### The Defendant's Services to an Iranian Intelligence Asset

Since at least in or about 2014, the defendant has received regular payments from Iran from Khazein, an Iranian citizen and businessman, who is also an asset for the Iranian intelligence services; has been a member of the Basij, a volunteer auxiliary force under the Islamic

Revolutionary Guard Corps ("IRGC");[1] and has provided procurement services and international financial services for the Iranian intelligence services and military. For example, on January 3, 2019, Khazein received from one co-conspirator, and then forwarded to a second co-conspirator, a letter marked highly confidential and addressed to an official with Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), Iran's military, which referred to clandestine foreign currency exchange services for Iran's armed forces.[2] Similarly, on July 20, 2020, a co-conspirator emailed a letter drafted for Khazein's signature describing how Khazein has cooperated with the Intelligence and Public Security Police Operations Center of Greater Tehran for nearly four years, including cooperation with the NAJA Special Intelligence (the Law Enforcement Force of the Islamic Republic of Iran) and Public Security Police Operations Center (a domestic intelligence subdivision of NAJA). In July 2020, Khazein sent a co-conspirator, by electronic communication, a copy of his 1999 Basij identification card and a letter advising Khazein that he had been appointed to a particular position in the Basij forces. The Basij forces of the IRGC engage in activities like the enforcement of so-called morality laws, like compulsory hijab; and the policing and suppression of political gatherings. In December 2019, Khazein forwarded to a co-conspirator two letters, one of which was signed by the Iranian Minister of Intelligence, describing the construction of an intelligence university by the MOIS, Iran's principal intelligence agency; Khazein was identified as MOIS's expert and representative for handling the importation of construction equipment.[3]

The payments that the defendant received from Khazein were made through a variety of deceptive and secretive means, including using an Iranian illicit payment service, international wire transfers through cutouts, and cash. These payments were supposed to be made monthly. The defendant has also provided Khazein with services, including giving him credit cards providing access to the U.S. financial system; maintaining bank accounts at his request; making

---

[1] The IRGC has been designated as a Foreign Terrorist Organization by the U.S. Department of State and as an SDGT by the U.S. Department of the Treasury ("Treasury Department"). *See* U.S. Department of State, *Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019), available at https://2017-2021.state.gov/u-s-designates-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/index.html; U.S. Department of the Treasury, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority* (Oct. 13, 2017), available at https://www.treasury.gov/press-center/press-releases/Pages/sm0177.aspx; U.S. Department of the Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), available at https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

[2] MODAFL has been designated as an SDGT by the Treasury Department. *See* U.S. Department of the Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), available at https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

[3] MOIS has been designated as an SDGT by the Treasury Department and identified as a human rights abuser. *See* U.S. Department of the Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), available at https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

payments through U.S. payment facilities at his request; facilitating his import of commodities to Iran; buying computer tools at his request; and offering to act as a straw owner of businesses in the U.S. for Khazein.

### The Defendant's Unexplained Assets and Structured Cash Deposits

Since approximately March 2019, the defendant has made over 100 cash deposits to a checking and savings account she holds at particular U.S. bank ("Bank-1"), totaling over $500,000. The vast majority of these deposits—at least 98, totaling around $445,000—began on July 21, 2020, less than one week after the defendant made a payment to a person in the United States at Khazein's request. The deposits were structured, *i.e.*, frequent deposits less than $10,000, including deposits made on the same day and on multiple consecutive days.

During a July 1, 2021 search of the defendant's residence pursuant to a judicially-authorized search warrant, FBI agents identified and seized over $10,000 in U.S. currency and at least approximately $150,000-worth [4] of high-end luxury goods, including jewelry, watches, handbags, and shoes, most of them new and in boxes with receipts.

### The Defendant's False Exculpatory Statements

Following her July 1, 2021 arrest, the defendant was interviewed after being advised of, and waiving, her *Miranda* rights and right to counsel. During that interview, the defendant initially denied knowing Khazein and falsely pretended not to recall his name, but later admitted that she has known him for years and understands him to be connected to Iranian intelligence. The defendant further admitted that she had personally met with Khazein as recently as in or about August 2020 in his offices in Tehran, that she opened bank or other financial accounts for Khazein, received money from him in the United States, made payments at his request, visited him in Iran on prior occasions, and that he had visited her in the United States.

In other portions of the interview, after she was asked about emails recovered from her accounts in which she discussed multi-million-dollar international wire transfers with Mehdizadeh, the defendant claimed her email must have been hacked because she did not recognize their contents. When she was then confronted with WhatsApp text conversations in which she was a participant where those schemes were further discussed, the defendant claimed not to recognize those messages either, but admitted knowing the other participants in the chats. The defendant further claimed alternatively that the hundreds of thousands of dollars deposited since July 2020 in accounts she controlled were obtained from sales of goods to friends and associates she made related to her fiancé's import/export business, or from an inheritance from a deceased family member.

## Procedural History

On June 29, 2021, a grand jury in this District returned the Indictment charging Bahadorifar in four counts with (i) conspiring to violate the International Emergency Economic Powers Act, in

---

[4] The valuation of these items has not yet been tabulated and this figure is approximate.

violation of Title 50, United States Code, Section 1705; (ii) conspiring to commit bank and wire fraud, in violation of Title 18, United States Code, Section 1349; (iii) conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); and (iv) structuring, in violation of Title 31, United States Code, Section 5324(a)(3) and (d)(2). Later the same day, Magistrate Judge Ona T. Wang issued a warrant for the defendant's arrest based on the charges contained in the Indictment.

On or about June 30, 2021, the Honorable Lewis J. Liman, United States District Judge, issued a post-indictment restraining order for funds up to and including $84,651.97 in Bahadorifar's Bank-1 checking account and an additional $359,488.03 in Bahadorifar's Bank-1 savings account, finding probable cause that such funds constitute property that would be subject to criminal forfeiture in the event of Bahadorifar's conviction for a violation of Title 31, United States Code, Section 5324 as charged in Count Four of the Indictment. On or about July 1, 2021, that order was served on legal representatives for Bank-1.

On or about July 1, 2021, Judge Scott held an initial appearance and presentment pursuant to Rule 5(c)(3) in the Central District of California. Prior to the hearing, Pretrial Services in CDCA prepared a report which included personal background and history information for the defendant including residence, education, marital status, citizenship and travel information, employment, and health information. According to the report, the information provided by the defendant to Pretrial Services was verified by Mehdizadeh, who reported that he and the defendant have been in a romantic relationship for four years. However, Mehdizadeh could not verify the information provided by the defendant in at least two key respects. First, Mehdizadeh only partially verified the defendant's employment status; although he confirmed her employment at a department store, Mehdizadeh claimed he did know how much she earned there. Second, Mehdizadeh did not verify the defendant's financial statements, as he claimed he "was not aware of the defendant's finances." In the report, Mehdizadeh was identified as a potential bond co-signor.

At the conclusion of the hearing, Judge Scott ordered Bahadorifar be released on bail conditions, as follows:

- $80,000 Personal Recognizance Bond;
- Affidavits of surety without justification signed by "resp[onsible] 3rd party(s);"
- Pretrial Services Supervision as directed by Pretrial Services;
- Surrender of all passports and travel documents, with any international travel to be first declared to Pretrial Services and permitted by the Court, and domestic travel first declared to Pretrial Services and limited to CDCA, SDNY, and points for the purpose of direct travel in between those districts;
- Maintain residence at current address, notification to Pretrial Services before moving;
- Maintain or actively seek employment, with any employment to be approved first by Pretrial Services;
- No direct or indirect contact with known victims or witnesses, except Saman Mehdizadeh, or any co-defendants except in presence of counsel;
- No sale or transfer of assets greater than or equal to $5,000 without prior notice to the court;

- Location monitoring, not including a monitoring bracelet, to be enforced via a voice identification monitoring program administered via cellular telephone with Pretrial Services; and
- Curfew at the discretion of Pretrial Services.

Judge Scott then ordered that the defendant be released forthwith with all conditions of the bond met by noon on July 2, 2021. At the Government's request, Judge Scott stayed the bail order for 24 hours to allow the Government to appeal to this Court.

## Legal Standard

This Court, as "the court having original jurisdiction over the offense," has jurisdiction over the Government's appeal of the release order. *See* 18 U.S.C. § 3145(a)(1); *United States v. El-Edwy*, 272 F.3d 149, 153 (2d Cir. 2001) (holding that, for purposes of a motion under § 3145(a) for revocation of a release order issued by a magistrate judge in another district where the defendant was arrested, "the court having original jurisdiction over the offense" is "the district in which the prosecution of the offense is pending," and noting that "[w]ith respect to the decision whether to detain or conditionally release the defendant, . . . section 3145(a) makes clear that the ultimate authority lies with the district that has the primary interest in the question – the district in which the prosecution is pending"); *see also, e.g.*, *United States v. Dominguez*, 509 F. App'x 28, 29-30 (2d Cir. 2013) (affirming revocation, by a district court in this District, of an order issued by a magistrate judge in the Southern District of Florida releasing a defendant who had been indicted in this District).

A district court reviews *de novo* a magistrate judge's decision to release or detain a defendant pending trial. *Gotti v. United States*, 358 F. Supp. 2d 280, 283 (S.D.N.Y. 2005); *see also United States v. Leon*, 766 F.2d 77, 80 (2d Cir 1985) ("[A] district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion.").

The Government ultimately bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

In assessing a defendant's risk of flight and the danger to the community presented by release, a court must consider four factors:

(1) the nature and circumstances of the offense charged . . . ;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## Argument

The defendant should be detained because she presents a risk of flight and is a danger to the community.

First, Bahadorifar is a dual Iranian-American citizen with substantial foreign contacts, recent foreign travel, and connections with Iranian governmental officials. *See United States v. Mones*, No. 19 Cr. 144 (AKH) (S.D.N.Y. Mar. 27, 2020) (denying bail in light of, *inter alia*, defendant's "deep foreign ties"). The defendant has strong ties to Iran, more than ample financial resources to flee, and the incentive to do so. The majority of the defendant's family resides in Iran, to which she traveled as recently as August and September 2020. She owns no real property in the United States and has no significant assets here other than bank account deposits, most of which are now restrained; she is employed by a department store, a job that can be done in countless cities around the world. Bahadorifar's recorded foreign travel and prior residency in other foreign countries is also substantial. Between in or about 2011 and her arrest in 2021, the defendant has traveled on over a dozen occasions, including to Turkey, Germany, the United Arab Emirates, Mexico, Qatar, and, of course, Iran. And she has every reason to flee the United States. The defendant faces serious charges, including violations of sanctions targeting Iran, a state sponsor of terrorism; bank and wire fraud; money laundering; and structuring of over a half million dollars in unexplained deposits. By her own admission, the defendant has undertaken some of those activities at the direction of an Iranian intelligence asset whom she believed to be connected to the MOIS, providing services that are exceptionally valuable to that service by virtue of her being a United States citizen and residing in this country.

Second, while the defendant describes her contacts in the CDCA as significant, she does not appear to have any ties to the Southern District of New York, the relevant jurisdiction in assessing whether she poses a risk of flight. *See, e.g., United States v. Lewis*, No. 16 Cr. 786 (NSR), 2017 WL 6547742, at *3 (S.D.N.Y. Dec. 20, 2017) (defendant lacked community ties where he had "no contacts with the community of New York," among other factors); *United States v. Lair*, No. 06 Cr. 1068 (CSH), 2007 WL 325776, at *3 (S.D.N.Y. Feb. 2, 2007) (noting that in

determining risk of flight the Court must assess "whether the accused will flee from the district in which the indictment has been lodged and his trial will take place").

Third, the evidence of Bahadorifar's involvement in the charged conduct is overwhelming and the defendant faces a significant prison sentence. The Government's investigation has included the execution of multiple search warrants on the defendant's electronic and cloud accounts, including Gmail, Yahoo, and iCloud accounts utilized by the defendant; a search of the defendant's residence; and review of voluminous financial records. The defendant has admitted to providing financial services to an intelligence official of a foreign government in defiance of economic sanctions. The defendant's denials are equally revelatory, demonstrating the defendant's awareness of her guilt and continued efforts to deny the severity of her conduct and the extent of her financial malfeasance, which the Government's investigation continues to unravel. The search of the defendant's home revealed hundreds of thousands of dollars in commodities which deepen the defendant's connections to unexplained wealth and money laundering activities. The weight of the evidence is significant, and, in combination with the penalties the defendant faces, only adds to her incentive to flee prosecution.

In addition to incentive, the defendant has the resources to flee. She has made over approximately $445,000 in unexplained cash deposits over the past year, after the defendant executed a United States payment at Khazein's direction. There also were hundreds of thousands of dollars of luxury goods, most in new condition, found in her apartment. Although many of these assets are now, as noted above, seized or restrained, the defendant has demonstrated significant capacity and facility to amass funds, obscure their source, and conceal and warehouse them. Beyond money, the defendant is an Iranian citizen who has ties to at least one Iranian governmental official, whose connections with the intelligence community may help facilitate her clandestine access to travel documents, assets, and personnel and perhaps most importantly, guarantee her safe harbor should she successfully escape to Iran. In addition to her means and access, both to money and influence, the defendant has demonstrated her proficiency in evading the law, having been involved in secretive international transfers of funds, use of illicit payment services, and large and unexplained cash transactions.

The defendant also is a danger to the community. Her ties to Khazein, in particular, and her ability—and obvious willingness—to conduct financial transactions and procure other services in the United States on his behalf, and on behalf of the Iranian government, demonstrate her dangerousness. Indeed, despite believing, as she admitted to law enforcement, that Khazein is part of the MOIS—an Iranian intelligence agency tied to human rights abuses, sponsorship of terrorism, and lethal operations outside Iran—she nonetheless provided access for him to the U.S. financial system and made payments at his request. The very reasons she is appealing to Iranian intelligence—her residence in the United States and willingness to provide services to Iranian intelligence services and assets—is what makes her dangerous to the community.

The Government respectfully submits that for these reasons, no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance in court. The Court should order the defendant detained for transport to this District to face the charges in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by:   /s/_____
Michael D. Lockard
Matthew J.C. Hellman
Jacob H. Gutwillig
Assistant United States Attorneys
Southern District of New York
(212) 637- 2193 / 2278 / 2215


cc: Kelley Munoz, Esq., Federal Defenders of the Central District of California (by email)