UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

             - v. -

NILOUFAR BAHADORIFAR,
   a/k/a "Nellie,"

       Defendant.

S1 21 Cr. 430 (RA)

 

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Michael D. Lockard
Matthew J.C. Hellman
Jacob H. Gutwillig
       Assistant United States Attorneys,
*- Of counsel -*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................. 2

   I.   The U.S. Sanctions Regime .................................................................................. 2

   II.  The Government of Iran's Targeting of Victim-1 ................................................ 4

      A.   The Government of Iran's Prior Efforts Targeting Victim-1 ............................ 4

      B.   The Plot to Kidnap Victim-1 ........................................................................... 5

   III. The Defendant's Criminal Conduct ..................................................................... 7

      A.   The Defendant Provides Services to the Government of Iran ........................... 7

      B.   The Defendant's Structured Bank Deposits .................................................. 11

   IV. The Indictment and the Defendant's Post-Arrest Statement ............................ 12

   V.   The Defendant's Guilty Plea .............................................................................. 12

   VI. The Presentence Investigation Report ............................................................... 13

DISCUSSION ............................................................................................................. 13

   I.   The Guidelines Sentencing Range ..................................................................... 13

   II.  The Court Should Impose a Sentence Within the Stipulated Guidelines Range ............. 16

      A.   The Defendant's Conduct Warrants A Guidelines Sentence ................................. 16

      B.   The Defendant's Arguments Do Not Merit A Non-Guidelines Sentence .............. 18

   III. Forfeiture ............................................................................................................ 20

CONCLUSION ........................................................................................................... 21

The Government respectfully submits this memorandum in response to the defendant's sentencing submission (Dkt. No. 54 ("Def. Mem.")), and in connection with the sentencing in this matter scheduled for April 7, 2023, at 10:00 a.m.  Pursuant to a plea agreement with the Government, the defendant was convicted of (i) conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1701; and (ii) structuring, in violation of 31 U.S.C. § 5324.

The defendant's convictions stem from her efforts to, among other things, assist Iranian nationals, including at least one individual affiliated with Iranian intelligence services, Mahmoud Khazein, in evading sanctions designed to curb the same services' ability to bring about their missions of terror and human rights abuse in Iran and around the globe.  The defendant made a payment on Khazein's behalf which, as described below, was part of a plot—with which the defendant is not charged—to kidnap a prominent Iranian dissident living in Brooklyn, New York ("Victim-1")[1] for rendition to Iran in order to silence her criticism of the Iranian regime.  The Government does not allege that the defendant had specific knowledge of the kidnapping plot; however, as described below, the defendant knew that Khazein was affiliated with Iranian intelligence and she acted on his behalf.  The defendant also provided access to credit cards issued by U.S. banks and made payments to U.S. persons at Khazein's direction.  Through her actions, the defendant provided access to U.S.-based financial networks and services, effectively procuring them for the use of the Iranian intelligence community.  In addition, the defendant amassed significant unexplained wealth and made concerted efforts to hide it, accumulating hundreds of

---

[1] The Government anticipates that Victim-1 will make a victim impact statement at the sentencing hearing.

thousands of dollars in cash over a short period of time and masking the origin of those assets through structured deposits.

For the reasons set forth below, the Government respectfully submits that the Court should impose a sentence within the Stipulated Guidelines Range of 46 to 57 months' imprisonment and order the defendant to forfeit $476,100, consistent with the consent preliminary order of forfeiture entered in this matter (*see* Dkt. No. 45).

## BACKGROUND

### I.      The U.S. Sanctions Regime

This case arises in the context of comprehensive national security controls and economic sanctions imposed against the Government of the Islamic Republic of Iran (the "GOI"), resulting from its support for terrorism, pursuit of nuclear weapons and ballistic missiles capable of delivering them, actions contributing to regional instability, and human rights abuses, including an aggressive and deadly campaign to target Iranians living outside Iran who are critical of the GOI, its policies, and actions.

Under the IEEPA, the President has the authority to declare a national emergency with respect to unusual and extraordinary threats to this nation's national security, foreign policy, or economy, which have their source in whole or substantial part outside the United States. *See* 50 U.S.C. § 1701(a). The GOI and its malign policies and actions have been identified as such unusual and extraordinary threats since November 14, 1979, when the current regime came to power, overthrowing the former Iranian government and, among other things, seizing the U.S. Embassy and holding more than 50 Embassy personnel hostage for 444 days. *See* Executive Order 12170, 434 Fed. Reg. 65,729 (Nov. 14, 1979); *see also* U.S. STATE DEPT., OFFICE OF THE HISTORIAN, *The Iranian Hostage Crisis*, *available at* https://history.state.gov/departmenthistory/short-history/iraniancrises.

The current sanctions regime originated in 1995, when the President declared a national emergency in response to the GOI's support for international terrorism, efforts to undermine the Middle East Peace Process, and the acquisition of weapons of mass destructions and the means to deliver them. *See* Executive Order 12957, 60 Fed. Reg. 14,615 (Mar. 15, 1995); *see also* Executive Order 12959, 60 Fed. Reg. 24,757 (May 6, 1995); Executive Order 13059, 62 Fed. Reg. 44,531 (Aug. 19, 1997). That national emergency has remained continuously in effect since, and every successive President has found that the actions and policies of the Government of Iran pose an unusual and extraordinary threat. *See Continuation of the National Emergency With Respect to Iran*, 88 Fed. Reg. 15595 (Mar. 10, 2023).

In response to that national emergency, among other things, the export, sale, or supply of goods, technology, or services from the United States, or by U.S. persons, directly or indirectly to Iran or to the GOI is prohibited, unless authorized by a license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"). *See* 31 C.F.R. § 560.204. The sanctions regime is "primarily concerned with a few key actions and policies at the heart of the threat posed by the Iranian government," but, "[b]y design . . . is deliberately overinclusive." *United States v. Banki*, 685 F.3d 99, 108 (2d Cir. 2012). "[T]o reform the actions of the government of Iran, Executive Order 12,959 and the [Iran Transactions and Sanctions Regulations] adopt a blunt instrument: broad economic sanctions intended to isolate Iran." *Id.* (citing *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004)). The prohibited export of "services" includes financial and banking services. *See United States v. Atilla*, 966 F.3d 118, 124 (2d Cir. 2020).

Among the GOI's malicious practices is that of transnational repression, that is, targeting persons outside Iran for harassment, intimidation, and violence. *See* Consolidated Appropriations

Act of 2023, Pub. L. 117-328, Title II, § 202 (Dec. 29, 2022) ("HUNT Act") ("Congress finds that the Government of the Islamic Republic of Iran surveils, harasses, terrorizes, tortures, abducts, and murders individuals who peacefully defend human rights and freedoms in Iran, and innocent entities and individuals considered by the Government of Iran to be enemies of that regime, including United States citizens on United States soil, and takes foreign nationals hostage . . . ."). Congress recently enumerated over a dozen alleged plots by the GOI in recent years to bomb, shoot, kidnap, harass, and gather intelligence against victims in the United States, Canada, the United Kingdom, France, Germany, Denmark, Turkey, and Africa. *Id.*

## II.     The Government of Iran's Targeting of Victim-1

For years, the GOI has targeted Victim-1, a journalist, author, and human rights activist residing in Brooklyn, New York. Victim-1 is a U.S. citizen of Iranian origin who has publicized the GOI's human rights abuses; discriminatory treatment of women; suppression of democratic participation and expression; and use of arbitrary imprisonment, torture, and execution to target its political opponents; and has sought to mobilize public opinion in Iran and around the world to bring about changes to the regime's laws and practices.

### A.  The Government of Iran's Prior Efforts Targeting Victim-1

In approximately 2018, Iranian government officials attempted to induce relatives of Victim-1, who reside in Iran, to invite Victim-1 to travel to a third country, apparently for the purpose of having Victim-1 arrested or detained and transported to Iran for imprisonment. Iranian government officials offered to pay Victim-1's relatives in exchange for their invitation to Victim-1, but Victim-1's relatives did not accept the offer. (Presentence Investigation Report, dated March 7, 2023 (the "PSR") ¶ 4).

On or about July 29, 2019, the Chief of the Revolutionary Courts in Iran publicly stated that anyone who sent videos considered against the regime, in particular videos contrary to the

GOI's criminal laws mandating that women and girls wear head coverings in public, to Victim-1 was committing the crime of cooperating with a hostile foreign government and would be sentenced from one to 10 years' imprisonment.  (PSR ¶ 6).

In approximately September 2019, a relative of Victim-1 was arrested by Iranian government officials on charges purportedly based on the relative's association with Victim-1. Victim-1's relative was later sentenced to eight years' imprisonment.  (*Id.*).

### B.  The Plot to Kidnap Victim-1

Beginning in at least approximately June 2020, the GOI plotted to kidnap Victim-1 from within the United States in furtherance of the regime's efforts to silence Victim-1.  (PSR ¶ 7).  On multiple occasions in 2020 and 2021, agents of the GOI procured the services of private investigators to surveil, photograph, and video record Victim-1 and Victim-1's household members, as part of the plot to kidnap Victim-1 for rendition to Iran.  (PSR ¶ 8).  These agents of the GOI procured the surveillance by misrepresenting their identities and the purpose of the surveillance to the investigators and laundered money into the United States from Iran in order to pay for the surveillance, photos, and video recordings of Victim-1.  (*Id.*).

The defendant's co-defendants, Alireza Shavaragohi Farahani, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," Mahmoud Khazein, Kiya Sadeghi, and Omid Noori,[2] hired a Manhattan-based private investigator ("Investigator-1"), to conduct surveillance on Vicitm-1 and Victim-1's household in Brooklyn.  Farahani is an Iranian intelligence official and managed a network of sources for Iranian intelligence, including Khazein, Noori, and Sadeghi, in their actions targeting

---

[2] As noted above, the defendant is not charged with participating in the kidnapping plot, though, as described below, she did cause a payment in furtherance of the plot at Khazein's direction. While the Government does not allege that the defendant had specific knowledge of the kidnapping plot, the plot is described here to illustrate the danger and sentencing significance of providing services to Iran, even when the provider is unaware of the ultimate purpose of those services.

Victim-1.[3]  (*See* Dkt. No. 14, S1 21 Cr. 430 (the "Indictment") ¶ 8).  Khazein is an intelligence

asset of the GOI.  Khazein was appointed to a position in the Basij, a volunteer auxiliary division

of the Islamic Revolutionary Guard Corps, in or about 1999, was named Head of the Office of

Ceremonies at the General Office of International Affairs for Iran's Expediency Council in or

about 2016, and has served as an expert advisor to the Ministry of Intelligence and Security

("MOIS")[4] with respect to the construction of a National University for Intelligence and Security.

(Ind. ¶ 9).  Khazein has cooperated with Iranian intelligence agencies since at least approximately

2014.  (*Id.*).

On multiple occasions in 2020 and 2021, as part of the plot to kidnap Victim-1, Farahani

and his network procured the services of private investigators, including Investigator-1, to surveil,

photograph, and video record Victim-1 and Victim-1's household members in Brooklyn.  (PSR ¶

8).  The extensive surveillance that Farahani's network procured included requests for days' worth

of surveillance at Victim-1's home and the surrounding area, videos and photographs of Victim-

1's family and associates, surveillance of Victim-1 outside Victim-1's residence, and the

installation of and access to a live high-definition video feed depicting Victim-1's home.  (*Id.*).

---

[3] Farahani's network also targeted individuals in Canada, the United Kingdom, and the UAE, procuring private investigator surveillance of, among other victims, an Iranian expatriate journalist and political commentator.  (*See* Indictment ¶ 8(c)).

[4] The MOIS was designated by OFAC on or about February 16, 2012, as a Specially Designated National ("SDN") under Executive Orders Nos. 13224, 13553, and 13572 for being responsible for or complicit in the commission of serious human rights abuses against the Iranian people and Syrian people and for its support to terrorist groups, including al Qaeda, al Qaeda in Iraq, Hizballah, and Hamas. U.S. DEPT. TREASURY, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), *available at* https://home.treasury.gov/news/press-releases/tg1424.  According to OFAC, the MOIS has played a key role in the Iranian regime's brutal human rights abuses against the Iranian people.  MOIS agents are responsible for beatings, sexual abuse, prolonged interrogations, and coerced confessions of prisoners, particularly political prisoners.  MOIS has employed mock executions and forms of sexual violence in its interrogations of prisoners, and its agents have arrested and detained members of the Baha'i religion without charges. *Id.*

The network procured the surveillance by misrepresenting their identities and the purpose of the surveillance to the investigators, including to Investigator-1, and laundered money into the United States from Iran in order to pay for the surveillance, photos, and video recordings of Victim-1. (*Id.*).  Sadeghi acted as the network's primary point of contact with the private investigators in the United States, and Noori facilitated payment to the investigators in furtherance of the plot targeting Victim-1.  (*Id.*).  As described below, the defendant made the initial payment to Investigator-1 using an electronic payment service, sent with the message "Requested from Mr. M. Khazein." (PSR ¶ 11).

As part of the kidnapping plot, the Farahani-led intelligence network also researched methods of transporting Victim-1 out of the United States for rendition to Iran.  (PSR ¶ 9). Khazein, for example, researched travel routes from Victim-1's residence to a waterfront neighborhood in Brooklyn, the location of Victim-1's residence relative to Venezuela, and the location of Victim-1's residence relative to Tehran.  (*Id.*).[5]

### III.    The Defendant's Criminal Conduct

#### A.  The Defendant Provides Services to the Government of Iran

For at least several years, the defendant provided illegal services to Iran, including to Khazein, in exchange for payment and the hope of profiting from illicit business transactions.

Beginning at least in or about 2014, the defendant received regular payments from Iran from Khazein and provided procurement services and international financial services for the Iranian intelligence services and military.  (PSR ¶ 15).  The payments the defendant received from

---

[5] The GOI's efforts to kidnap and kill Victim-1 continued after the charges were brought in this case.  On January 24, 2023, an indictment was filed in this District, S4 22 Cr. 438 (CM), charging three Azeri organized crime figures with offenses arising out of their participation in a plot to assassinate Victim-1 based on tasking from Iran.  *See United States v. Amirov et al.*, S4 22 Cr. 438 (CM), Dkt. No. 22 (Jan. 27, 2023).

Khazein were made through a variety of deceptive and secretive means, including using an Iranian illicit payment service ("Iranian Payment Service"), international wire transfers through cutouts, and cash. (PSR ¶ 16). These payments were supposed to be made monthly. (*Id.*).

The defendant repeatedly asked Khazein for financial assistance, and eventually began receiving a monthly payment. In November 2014, the defendant exchanged emails with the Iranian Payment Service about money the defendant was supposed to receive from family members in Iran and from Khazein. (PSR ¶ 10). That same month, the defendant made cash deposits to a particular bank account in the amounts of $1,500 and $2,000, corresponding to the amounts she expected to receive from Iran. (*Id.*). In January 2015, Khazein sent the defendant $6,000 by wire transfer through an intermediary bank account located in Norway. (*Id.*). Between approximately November 2014 and June 2016, the defendant made another 15 cash deposits to that bank account, ranging from $200 to $4,000, and typically in amounts of approximately $1,000 to $2,000, which appear to have been sent principally by Khazein. (*Id.*).

In June 2017, Khazein caused $2,000 to be transferred by wire to the defendant's bank account through another intermediary. (*Id.*) In July 2017, the defendant exchanged emails with the Iranian Payment Service about the fact that she was supposed to be paid monthly by Khazein. The Iranian Payment Service told the defendant that transfers would be easier if she opened an account at a different financial institution. (*Id.*).

### 1. Providing Access to the U.S. Financial System

The defendant also provided Khazein with services, including giving him credit cards and providing access to the U.S. financial system; maintaining bank accounts and making payments through U.S. payment facilities at his request; facilitating his import of commodities to Iran; buying computer tools for him; and offering to act as a straw owner of businesses in the U.S. for Khazein.

For example, in January 2015, the defendant added Khazein as an accountholder on a credit card she held. (PSR ¶ 17). In January 2018, the defendant sent an email to Khazein about the credit card, conveying that the bank would continue to charge the account that the defendant had opened and closed for Iran unless Khazein sent her funds. (*Id.*). The defendant suggested that Khazein could give money to a friend of hers in Iran who was traveling to the United States. (*Id.*). In August 2020, the defendant added Khazein as an accountholder on another credit card. That credit card was used to make purchases outside Iran, principally in Turkey, totaling approximately $1,899.44. (*Id.*).

In November 2020, the defendant paid approximately $100 for an iPhone data recovery tool, which she forwarded to Noori by email. (PSR ¶ 18). Shortly before the defendant made this online purchase, Khazein sent her a text with a link to the site and asked her to "pay it from my account" and send it to Noori. (*Id.*). Khazein also told the defendant he would send her the money if necessary. (*Id.*). Noori researched the tool before the defendant's purchase, then visited the website of the provider afterwards to verify. (*Id.*).

In December 2018, the defendant emailed Khazein about a plastics factory in the United States that was closing and proposed that Khazein buy the factory with the defendant acting as his representative. (PSR ¶ 17).

In addition to the services the defendant provided to Khazein and his associates, since at least 2012 the defendant has discussed with Iranian business partners and family members large currency and gold transactions, including transactions related to international transfers of tens or hundreds of millions of dollars, including Iranian currency, in countries including Russia and China. (PSR ¶ 13). The documents appear to relate either to fraudulent schemes, money laundering techniques, or both. Based on the terms in the purported contracts, agreements, and

bank-to-bank messages—which, among other things, include descriptions of the operation of bank-to-bank funds transfers that are incorrect, identify purportedly authorizing bank officers who did not work at the relevant bank at the relevant time, and appear to lack legitimate economic justification—the documents appear to relate to either fraudulent schemes, money laundering techniques, or both. (*Id.*).

In approximately June 2018, the defendant and her significant other ("Individual-1")[6] opened a bank account in a particular U.S. financial institution for a company called "Kalex Industries." (*Id.*) The purported business address for Kalex Industries was the defendant's residential address, and appears to have been created for the purpose of participating in large scale currency transactions. (*Id.*) In WhatsApp communications between the defendant and Individual-1 prior to opening the Kalex Industries account, they described the putative transactions as "money laundry." (*Id.*). The defendant asked Individual-1 what money laundering was, and Individual-1 described it in sanctions-evasion terms: "[a] [t]rick that people in other countries [who] can not transfer money which they are [have] got [get] citizens of USA[,] they pay boundaries [bounties] to get the money into American bank [and] save it." It does not appear that any of these transactions has been completed or that the defendant received any money in connection with them. (*Id.*).

### 2. Payment to Investigator-1

In connection with the plot to kidnap Victim-1, Sadeghi sent Noori a message containing the information for Investigator-1's account with an electronic payment service on June 17, 2020. (PSR ¶ 11). Noori then sent the defendant the information Noori had received from Sadeghi. (*Id.*).

---

6 ██████████████████████████████████████████████████
██████████

The defendant replied, in Farsi, that she would "send it" to Noori in an hour, and she later sent Noori a screenshot of a payment confirmation for her $670 payment to Investigator-1, the first payment relating to the surveillance assignment, with the payment note "Requested from Mr. M.. Khazein." (*Id.*). The defendant asked for confirmation Noori had received it, and Noori affirmed. (*Id.*).

Two days later, on July 19, 2020, Noori sent a message to Sadeghi attaching a payment confirmation he had received from the defendant. (PSR ¶ 12). Sadeghi sent this screenshot to Private Investigator-1 by email the same day. (*Id.*). Thereafter, Khazein, Sadeghi, and Noori exchanged communications and images relating to the surveillance of Victim-1 and the plot to kidnap Victim-1 and rendition Victim-1 to Iran. (*Id.*).

### B.  The Defendant's Structured Bank Deposits

Beginning in approximately 2019, the defendant began making unexplained cash deposits to her accounts at a particular financial institution, with the frequency of the deposits increasing significantly in July 2020. All but two of the deposits were less than $10,000. In total, the defendant structured at least approximately $476,100 in more than 120 individual deposits. (PSR ¶ 21).

Between April 1, 2019, and March 4, 2020, the defendant made 21 cash deposits ranging from $100 to $9,680 and totaling $57,710. (*Id.*). The next cash deposit of $6,000 was made on July 22, 2020; between that date and May 2, 2021 (the most recent currently available records), The defendant made 102 cash deposits ranging from $400 to $18,000 and totaling $476,100. (*Id.*). During this time, the defendant frequently made cash deposits within a few days or even on the same day that were individually less than $10,000 but more than $10,000 in the aggregate. (*Id.*). In a 27-week period since that date, she made 85 deposits (each less than $10,000) totaling $393,100. (PSR ¶ 22).

### IV.     The Indictment and the Defendant's Post-Arrest Statement

The defendant was arrested on July 1, 2021, in connection with charges contained in an underlying indictment, 21 Cr. 430 (RA).  (Dkt. No. 2).  Following her arrest, the defendant participated in an interview with law enforcement.  During that interview, the defendant initially denied knowing Khazein and falsely pretended not to recall his name, but later admitted that she has known him for years and understands him to be connected to Iranian intelligence.  (PSR ¶ 24). The defendant further admitted that she had in-person with Khazein as recently as in or about August 2020 in his offices in Tehran, that she opened bank or other financial accounts for Khazein, received money from him in the United States, made payments at his request, visited him in Iran on prior occasions, and that he had visited her in the United States.  (*Id.*).  Following her presentment in the United States District Court for the Central District of California, the defendant was released on bail conditions.  (Dkt. No. 5).

On July 13, 2021, the Indictment was unsealed, charging the defendant with conspiring to violate the IEEPA in violation of 50 U.S.C. § 1705 (Count Two); conspiring to commit wire and bank fraud, in violation of 18 U.S.C. § 1349 (Count Three); conspiring to launder money in violation of 18 U.S.C. § 1956(h) (Count Four), and structuring in violation of 31 U.S.C. § 5324 (Count Five).  The defendant's co-defendants were also charged with conspiring to kidnap Victim-1 in violation of 18 U.S.C. § 1201(c) (Count One).  The defendant is not charged with participating in the kidnapping plot.

### V.     The Defendant's Guilty Plea

On December 15, 2022, the defendant entered a plea of guilty to Counts Two (conspiracy to violate the IEEPA) and Five (structuring) of the Indictment, pursuant to a plea agreement.  In the plea agreement, the defendant stipulates that the total offense level under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), assuming the application of U.S.S.G.

§§ 3E1.1(a) and (b), of 23; an applicable Criminal History Category of I; and a Guidelines sentencing range of 46 to 57 months' imprisonment.  Pursuant to the plea agreement, the defendant also stipulated to a Guidelines fine range of $20,000 to $1 million and forfeiture in the amount of $476,100.  The Court entered a Consent Preliminary Order of Forfeiture imposing a forfeiture money judgment in that amount.  (*See* Dkt. No. 45).

## VI.     The Presentence Investigation Report

In the PSR, the U.S Probation Office ("Probation") calculates a total offense level, assuming the application of U.S.S.G. §§ 3E1.1(a) and (b), of 21 (PSR ¶¶ 33-46); an applicable Criminal History Category of I (*id*. ¶ 49); and a Guidelines sentencing range of 37 to 46 months' imprisonment (*id*. ¶ 74).

## DISCUSSION

## I.     The Guidelines Sentencing Range

The PSR calculates a total offense level of 21, while the plea agreement contains a stipulated Guidelines total offense level of 23.  The difference results from the PSR's treatment of Counts Two and Five as a single group because "because they involve the same victim (society at large)." (PSR ¶ 35).  The Government respectfully suggests that the plea agreement sets forth the correct Guidelines calculation, and the societal harms caused by violations of the IEEPA and violations of the structuring laws are distinct and the counts should not be grouped.

Part D of Chapter 3 of the Guidelines is designed to "provide incremental punishment for significant additional criminal conduct" while preventing "multiple punishment for substantially identical offense conduct."  U.S.S.G. Part 3D, Introductory Commentary.  Section 3D1.2 of the Guidelines provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group."  Counts involve substantially the same harm when, *inter alia*, they involve "the same victim and two or more acts or transactions connected by a common criminal

13

objective or constituting part of a common scheme or plan."   § 3D1.2(b).   Application note 2 explains that, "[f]or offenses in which there are no identifiable victims (*e.g.*, drug or immigration offenses, where society at large is the victim), the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed.   In such cases, the counts are grouped together when the societal interests that are harmed are closely related."   An example of offenses harming the same societal interest are unlawfully entering the United States and possessing fraudulent citizenship documents, while an example of offenses harming different societal interests are narcotics crimes and immigration offenses.   U.S.S.G. § 3D1.2, cmt. n. 2.   *See, e.g.*, *United States v. Nanthanseng*, 221 F.3d 1082, 1084 (9th Cir. 2000) (societal interests threatened by a drug conspiracy and by a firearms conspiracy were not closely related); *United States v. Gallo*, 927 F.2d 815, 823-24 (5th Cir. 1991) (drug trafficking and money laundering implicate different societal interests).

The societal interests at stake with the IEEPA are different than the societal interests at stake with structuring.   The IEEPA is located in Title 50 of the United States Code, relating to war and the national defense.   The IEEPA relates specifically to "unusual and extraordinary threat[s], which [have] [their] source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."   50 U.S.C. § 1705(a).   The IEEPA empowers the President to declare national emergencies with respect to those threats and to respond to them by investigating, regulating, or prohibiting transactions involving foreign commerce and property interests of foreign persons.   *See* 50 U.S.C. § 1702(a)(1).   Pursuant to the IEEPA, the ITSR were adopted specifically to target the Government of Iran's "proliferation of weapons of mass destruction, state-sponsored terrorist activity, and efforts to frustrate Middle East diplomacy."   *Banki*, 685 F.3d at 108.

The structuring laws, on the other hand, are located in Title 31 of the United States Code, relating to money and finance.  Congress declared its purposes in enacting financial reporting requirements, including requiring reports and records that are useful in tax, investigative, regulatory, and counterterrorism efforts; preventing the laundering of criminal and terrorism funds; assessing the risk of financial institutions, products, and services; and establishing an information sharing framework among financial institutions, regulators, and investigators.  *See* 31 U.S.C. § 5311; *see also United States v. Dichne*, 612 F.2d 632, 640 (2d Cir. 1979) (discussing cash export reporting requirements and noting "the reports or records required will be useful not only for criminal purposes, but also in 'tax, or regulatory investigations or proceedings'" and that "we regard these non-prosecutorial interests as substantial").  The structuring laws, like other reporting laws, are principally focused on transparency in the financial system, which has benefits for various interests including effective tax reporting and collection, effective risk assessment for financial systems and effective risk management, and preventing or permitting the detection of the movements of criminal proceeds.  That societal interest is not "closely related" to the national security, economy, and foreign policy interests protected by the IEEPA, and the Counts should not be grouped.

The conduct underlying Counts Two and Five is also not part of "the same act or transaction" or "acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."  § 3D1.2.  The defendant's IEEPA violations resulted from services she provided and attempted to provide to Khazein and others between 2012 and 2021, including access to the U.S. financial system and attempts to generate and assist business and currency transactions.  The defendant benefited from these illegally exported services, among other things, by receiving bank wires into her bank account, sometimes through intermediary accounts, with the

Iranian origin concealed.  (PSR ¶¶ 13-20).  Her structuring violations arose from her separate efforts to prevent banks from reporting on cash deposits totaling over $470,000 between April 2019 and May 2021.  (PSR ¶¶ 21-22).  For this additional reason, the counts should not be grouped.

## II.     The Court Should Impose a Sentence Within the Stipulated Guidelines Range

The nature and seriousness of the defendant's offense, the need to promote respect for the law, and to provide just punishment, as well as the need to afford adequate deterrence to criminal conduct, all weigh in favor of a sentence within the Stipulated Guidelines Range.  Such a sentence is necessary to serve the purposes of sentencing.

### A.  The Defendant's Conduct Warrants A Guidelines Sentence

Violations of the IEEPA and the ITSR are not mere regulatory violations.  The ITSR and related Executive Orders are based on unusual and extraordinary threats posed by the GOI, and the nature and seriousness of that threat has continued to expand since the ITSR were first implemented.  The Annual Threat Assessment from the Office of the Director of National Intelligence, for example, concludes that "Iran will continue to threaten U.S. interests as it tries to erode U.S. influence in the Middle East," including by leveraging "diplomacy, its expanding nuclear program, its conventional, proxy, and partner forces, and its military sales and acquisitions to advance its goals."  OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, *Annual Threat Assessment*, p. 17 (Mar. 8, 2023), *available at* https://www.dni.gov/files/ODNI/documents/assessments/ATA-2023-Unclassified-Report.pdf.  Iran has "threatened to target former and current U.S. officials as retaliation for the killing of Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) Commander Qasem Soleimani,[7] and has previously attempted to conduct lethal

---

[7] According to OFAC, the IRGC-QF, "is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia" *See* Fact Sheet: Designation of Iranian Entities and Individuals for

operations in the United States." (*Id*.)  Congress documented numerous recent examples of the Government of Iran's involvement in an attempt to bomb a political rally in France; plotting to kill a dissident in Denmark; harassing and threatening BBC Persian employees in the United Kingdom; plotting to attack citizens of Israel in Ethiopia; and luring, kidnapping, and assassinating journalists and dissident political figures in France, the United States, Sweden, the Netherlands, Turkey, and Iraq, among other lethal plots.  *See* HUNT Act, § 202.

To be clear, the defendant is not charged with knowingly assisting the kidnapping plot targeting Victim-1.  But, as the Second Circuit has recognized, "the embargo is deliberately overinclusive.  Thus, for example, the [ITSR] prohibit the exportation of not only advice on developing Iranian chemical weapons but also advice on developing Iranian petroleum resources, *see* § 560.209; not only services to the Iranian government but also services to Iranian businesses, *see* § 560.204; and not only bombs but also beer, *see* § 560.204. In other words, to reform the actions of the government of Iran, Executive Order 12,959 and the [ITSR] adopt a blunt instrument: broad economic sanctions intended to isolate Iran." *Banki*, 685 F.3d at 108.  This case is an alarming example of why providing even facially innocuous services in violation of the IEEPA can have grave consequences, because those services may be in furtherance of clandestine, malign efforts that are in the heartland of why the sanctions were implemented.  Here, while the services, themselves, may arguably have appeared innocuous, the defendant knew that Khazein and his associates were anything but.  Prior to making the payment to Investigator-1, the defendant had known Khazein for years and, by her own admission, met with him in Tehran in approximately

---

Proliferation Activities and Support for Terrorism (Oct. 25, 2007) (*available at* https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx).      IRGC-QF   was designated by the Treasury pursuant to Executive Order 13224.

August 2020.  Even if the defendant did not know the specific purpose of the payment to Investigator-1 she was at a minimum well-aware of Khazein's identity and his connection to Iranian intelligence services.  Nevertheless, for years, the defendant knowingly provided Khazein with access to the U.S. financial system, and received money in return.

The need for deterrence is apparent.  Not only have GOI-linked threats persisted generally, as described above, but Victim-1 specifically has continued to be targeted.  Moreover, the GOI has continued its pattern of using both unwitting—such as Investigator-1—and witting—such as the defendants charged in *United States v. Amirov, et al.*—to carry out its repressive and deadly aims to silence critics of the regime.  It is necessary to send a clear message that any effort in furtherance of the GOI's overall aims, including facilitating payments and providing access to U.S. financial institutions, will be prosecuted and punished to the fullest extent of the law.

In addition to the IEEPA-related conduct, the defendant also is responsible for structuring the deposit of hundreds of thousands of dollars in unexplained cash.  The defendant did this across more than a hundred separate cash deposits, at a timing interval and in a matter consistent with her conscious attempt to obfuscate the source of these funds and avoid reporting it and/or paying taxes. (*See* PSR ¶¶ 21-22).  Moreover, the defendant discussed engaging in numerous apparently illicit financial transactions, both with Khazein and separately.  (*See* PSR ¶¶ 13-20).

Accordingly, the sentence imposed should appropriately reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to others.

### B.  The Defendant's Arguments Do Not Merit A Non-Guidelines Sentence

The defendant's sentencing arguments do not merit a below-Guidelines sentence, and certainly not the non-custodial sentence of probation she seeks.[8]

---

[8] ████████████████████████████████████████████████
████████████████████████████████████████

The defendant's submission describes the Iranian regime as "the foremost sponsor of global terrorism" and highlights the GOI's continued attempts to assassinate Victim-1.  (Def. Mem. at 1).  In noting that she is not charged in the kidnapping plot, the defendant's submission characterizes her as "but another in a long string of individuals who were manipulated by the Iranian intelligence service into aiding the murder and silencing of political opponents all over the world who give voice to the violent atrocities occurring there." (Def. Mem. at 6).  The defendant further likens herself to Investigator-1, who unwittingly conducted surveillance on Victim-1.  (*See id.*).  The Government does not allege that the defendant knew about the kidnapping plot or participated in it.  However, she is far from an unwitting participant.  The defendant had a years-long relationship with Khazein which, as described above, included receiving money from him and, in turn, providing financial and other services to Khazein.  In her post-arrest interview, the defendant first denied knowing Khazein, before later admitting that she not only knew him, but knew that he was connected to Iranian intelligence services and that she had met with him in-person in Iran as recently as approximately August 2020, shortly before Khazein and the Farahani-led network began plotting to kidnap Victim-1 for rendition to Iran.  Nevertheless, for at least several years the defendant knowingly provided services and assistance to Khazein and, later, others.  The Government does not seek to minimize the possible threat to the defendant posed by the GOI and GOI-aligned operatives; to the contrary, from its experience in this case and the *Amirov* prosecution, the Government is well-aware of the potentially deadly nature of that threat.  So too the defendant should have been.  She knew she was assisting Khazein, who she understood was connected to Iranian intelligence, and his associates, even if she was not specifically aware of their ultimate goals.

It also is important to recognize that the defendant's criminal conduct went beyond her dealings with Khazein or other individuals affiliated with the GOI.  Although she received money from Khazein, that hardly accounts for the hundreds of thousands of dollars in unexplained cash deposits the defendant made.  Put differently, while much of the focus of the defendant's sentencing submission is on the context of her IEEPA violation, the defendant engaged in distinct criminal conduct separate from that.  The Government recognizes the defendant's family support and the other mitigating circumstances set forth in her submission; however, the Government notes also that the defendant committed multiple crimes and, while she is less culpable than her co-defendants with respect to the IEEPA violation, the structuring conduct is all her own.

## III. Forfeiture

As set forth in the plea agreement, the defendant stipulated to the forfeiture of $476,100 and the Court has entered a Consent Preliminary Order of Forfeiture in that amount.  (Dkt. No. 45).

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence within the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to promote the legitimate purposes of sentencing.

Dated:  April 4, 2023
New York, New York

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:       _____/s/_____
Michael D. Lockard
Matthew J.C. Hellman
Jacob H. Gutwillig
Assistant United States Attorneys

cc:      Counsel of record (by ECF)

21